**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | | |
|---|---|---|
| GEORGE MADISON, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-00072-TWP-WGH |
| | ) | |
| CITY OF EVANSVILLE, | ) | |
| JASEN CLEGG, and DARIN CLIFTON, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| DARIN CLIFTON and JASEN CLEGG, | ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE MADISON, JR. | ) | |
| | ) | |
| Counter Defendant. | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants City of Evansville ("the City"), Jasen Clegg ("Officer Clegg"), and Darin Clifton's ("Officer Clifton") (collectively "Defendants") Motion for Summary Judgment (Filing No. 33) and Plaintiff George Madison, Jr.'s ("Madison") Cross-Motion for Summary Judgment on Defendants' Counterclaim (Filing No. 64). After being stopped by police officers for failing to stop at a stop sign while riding a bicycle, Madison was threatened with a taser, handcuffed, questioned, and then released without a citation. Because of this incident, Madison filed suit against the Defendants, asserting constitutional and state law tort claims. Officers Clegg and Clifton filed tort counterclaims against Madison for initiating this action. The parties moved for summary judgment on the others' claims. For the following reasons, the Court

grants Madison's Cross-Motion for Summary Judgment and grants in part and denies in part the Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Madison is a black male who works as a firefighter for the Evansville Fire Department. He also is a youth pastor at Memorial Baptist Church. On August 13, 2013, Madison was off-duty and riding his bicycle near the intersection of Kathleen Avenue and South Weinbach Avenue in Evansville, Indiana. He had just been riding his bicycle northbound on South Weinbach Avenue, approaching the intersection of South Weinbach Avenue and East Riverside Drive. This intersection was controlled by four-way stop signs.

As Madison arrived at the intersection, Evansville Police Department Officers Clegg and Clifton were at the intersection. The officers, each white males, were on-duty and traveling southbound on South Weinbach Avenue in a marked police vehicle. The officers were at the intersection just before Madison arrived, and they made a quick left turn onto Riverside Drive just in front of Madison on his bicycle and began traveling eastbound on Riverside Drive. Madison thought he personally knew one of the officers and thought they were playing around with him by cutting in front of him, so he waved to the officers. The officers misinterpreted the wave and believed that Madison had extended his middle finger. Then, instead of coming to a complete stop on his bicycle at the stop sign, Madison rode through the intersection because he was not aware that bicyclists have to stop at stop signs. Officer Clegg, the driver, turned the police vehicle around, activated the emergency lights, and stopped Madison near the intersection of South Weinbach Avenue and Kathleen Avenue. Noting that Madison was tall and had a muscular build,[1] Officer

---

[1] Madison is 6'2'' tall and weighed 195 pounds at the time of this incident.

Clifton stayed in his patrol car for about fifteen seconds to inform dispatch that they were making a stop.

Officer Clegg exited the vehicle and rapidly approached Madison in an angry manner. He demanded to know what Madison's problem was and why he threw his hands up at the officers and lectured Madison about following rules. Officer Clegg continued talking angrily and would not allow Madison to respond. Because of Officer Clegg's threatening approach and angry tone of voice, Madison feared for his safety. In an attempt to calm down the situation, Madison removed his cell phone from his pocket as he intended to call the chief of police, whom he knew personally. Madison was quiet and standing, straddling his bicycle during the encounter. By this point, Officer Clifton had also exited the vehicle and was standing behind Madison.

Officer Clegg continued talking to Madison, but he was not listening to the officer. The officers directed Madison multiple times to put down his cell phone, but he did not comply with their commands. Madison told the officers to give him a minute while he made the phone call. He did not tell them who he was trying to call.

Officer Clegg again told Madison to put down his cell phone, and when he failed to comply, Officer Clegg reached forward and grabbed Madison's hand that was holding the cell phone and snatched the cell phone from Madison's hand. This startled Madison, which caused him to flinch backward. Because of Madison's movement, Officer Clegg took a step back and pulled out his taser with his right hand, pointing it directly at Madison. Officer Clifton also reached for his taser but left it holstered because Officer Clegg already had his taser aimed at Madison.

When Madison saw that Officer Clegg was pulling out his taser, he immediately raised his hands in the air and said that he would do whatever the officers directed. They directed him to lay down on the ground, which he did on his own. Once Madison was laying on the ground face down,

Officer Clifton handcuffed him. Madison explained that he was a firefighter. Officer Clegg then holstered his taser, and Officer Clifton helped Madison to his knees. Officer Clegg began asking questions, and Madison would not respond to him. Then Officer Clegg remembered that he was wearing body camera equipment, so he activated the video recording. Officer Clifton asked Madison to identify himself, and Madison readily communicated with Officer Clifton. He gave his name and address and explained that he was a firefighter for the City of Evansville.

While Madison was on the ground, a member of his church was passing by and stopped to help. She asked if she should contact Pastor Brooks, an advocate for the black community, and Madison requested that she do so. Officer Clifton ran Madison's name through the Evansville police records system, which revealed an outstanding warrant for a black male named George Madison. Officer Clifton asked additional questions to clarify Madison's identity because of confusion concerning Madison's identity and the identity of his father, George Madison Sr., who was the subject of the outstanding warrant. After Officer Clifton confirmed Madison's identity and that he was an Evansville firefighter, Officer Clifton helped him to his feet and removed the handcuffs. Officer Clegg returned the cell phone to Madison, and the officers began to advise him that he had to obey traffic laws even when riding a bicycle.

Madison then tried to explain to the officers that he thought he recognized one of them and was waving to them when they drove in front of him. The officers continued to lecture him on obeying traffic laws as a bicyclist, not drawing attention to himself by waving his arms, and not getting on his cell phone when they were trying to conduct an investigation. Madison explained why he was making a phone call to the chief of police, explaining that he was fearful when Officer Clegg approached him aggressively. He began to refer to his experiences as a young, black male, and Officer Clegg interrupted him, saying that race had nothing to do with the stop and

investigation. Madison later testified during a deposition that the officers did not use any racial slurs or any profanity during the stop, and the officers did not give any indication that the stop was motivated by race.

After some additional conversation and disagreements, the officers returned to the police vehicle and Officer Clegg stopped the body camera video recording. They did not issue a citation to Madison for failing to stop his bicycle at the stop sign. Pastor Brooks then arrived at the scene, talked with Madison about what had happened, and offered him a ride home. Madison declined the ride home and made a phone call to the chief of police to explain what had just happened. He then recorded the experience and his feelings on his cell phone and posted his recorded note on Facebook, which is how he often expressed his feelings.

The length of time from when Officer Clegg exited the police vehicle, interacted with Madison, grabbed his hand, threatened use of the taser, got him on the ground, handcuffed him, and got him to his knees, to when Officer Clegg turned on the body camera equipment was approximately one and a half minutes. The length of time from when Officer Clegg turned on the body camera equipment to when he turned off the body camera equipment after getting back into the police vehicle was approximately ten and a half minutes. Therefore, Madison's stop lasted approximately twelve minutes. The officers explain that, after the handcuffs were removed and the cell phone was returned, Madison was free to leave, and he was not detained during the final five minutes of conversation between himself and the officers.

At the direction of an Evansville police sergeant, Lieutenant Bret Fitzsimmons called Madison in the evening of August 13, just a few hours after the incident. Lieutenant Fitzsimmons and Madison discussed the incident, and Madison explained that he thought the officers pulled him over because of his hand gesture not because of failing to stop at the stop sign. Madison did not

mention anything about race or that the stop was racially motivated. Lieutenant Fitzsimmons explained the process for filing a complaint.

Two days later, on August 15, 2013, Madison filed a citizen's complaint under oath and gave a recorded statement to Sergeant Brian Talsma of the Evansville Police Department's Internal Affairs Office. In the citizen's complaint and recorded statement, Madison explained the encounter with Officers Clegg and Clifton. He again made no allegation that the stop was racially motivated. He explained that he thought the stop was personal because of the misinterpreted hand gesture not because of failing to stop at the stop sign.

The incident garnered media attention and significant social media attention in the Evansville community. Madison's August 13, 2015 Facebook post recounting the incident received many responses on social media. Many of the responses asserted a suspicion that racial profiling likely was involved. To these comments, Madison replied, "I don't think race has anything to do with it. The way I was approached it could have happened to anybody." (Filing No. 33-3 at 8.) Soon after the incident, Madison reported to the Evansville Courier & Press that he did not think the stop was racially motivated (Filing No. 33-3 at 12). Then in a Facebook post to the Evansville Courier & Press on August 27, 2013, Madison stated, "I have never said this was a race issue." (Filing No. 33-3 at 13.)

Madison submitted a "notice of tort claim" on September 30, 2013, to the City of Evansville and others. The notice of tort claim described the incident and explained that the traffic stop was initiated because of Madison's hand gesture, failure to stop at the stop sign, or both (Filing No. 33-2 at 19).

On May 20, 2014, Madison initiated this lawsuit by filing his Complaint against the City of Evansville, Officer Clegg, and Officer Clifton. He asserted Fourth Amendment § 1983 claims

for excessive force, unreasonable seizure, and unlawful arrest against Officers Clegg and Clifton.

He also asserted Fourteenth Amendment § 1983 claims for equal protection and due process of

law against Officers Clegg and Clifton. He alleged that the officers had a duty to intervene with

each other to not violate his constitutional rights. Madison asserted a state law claim of assault

against Officer Clegg and against the City of Evansville under the doctrine of *respondeat superior*.

He also asserted state law claims of battery, false imprisonment, and excessive force against

Officers Clegg and Clifton and against the City of Evansville under the doctrine of *respondeat

superior*. In his Complaint, Madison alleged that the proffered reason for the stop—Madison's

failure to stop at the stop sign—was pretextual, and the actual reason for the stop was his race or

his hand gesture. Under his equal protection claim, Madison alleged the officers impermissibly

discriminated against him on the basis of his race.

Madison was deposed on September 10, 2014, and testified regarding the accuracy and

veracity of his earlier statements that he believed race was not an issue with the traffic stop. He

then was asked, "And so the first time that race has become an issue is when you filed a complaint

seeking money, correct?" to which he replied, "Yes, sir." (Filing No. 33-1 at 24.) Madison went

on to testify that his views regarding race being a motivating factor in the traffic stop changed over

time because of conversations with his wife, observations from other similar situations, and

reflecting on the incident. Madison testified that he did not have any evidence to show the traffic

stop was racially motivated and only Officers Clegg and Clifton would know in their hearts

whether race was a motivating factor for the stop.

Approximately two months after the deposition, on December 12, 2014, Officers Clegg

and Clifton filed four tort counterclaims against Madison on the basis that Madison filed race-

based claims against them with no evidence of racial animus and having earlier represented that

race was not an issue with the traffic stop. The officers' counterclaims are abuse of process, malicious prosecution, intentional infliction of emotional distress, and negligence. The City of Evansville and Officers Clegg and Clifton moved for summary judgment on Madison's claims, and Madison moved for summary judgment on the officers' counterclaims.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation

8

marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III. DISCUSSION

The Defendants request summary judgment on the constitutional and state law tort claims asserted by Madison, and Madison requests summary judgment on each of the state law tort counterclaims asserted by Officers Clegg and Clifton. The Court will address the parties' motions in turn.

### 1.    Madison's Cross-Motion for Summary Judgment

Madison moved for summary judgment on the officers' counterclaims for abuse of process, malicious prosecution, intentional infliction of emotional distress, and negligence, asserting that the officers cannot show damages or causation, each an essential element of the counterclaims alleged. Madison points to deposition testimony from Officers Clegg and Clifton, wherein they

testified that they cannot identify any damages that they have suffered as a result of Madison's lawsuit. He further explains that even if the officers can show an intangible damage to their reputation, they have no evidence that Madison's lawsuit caused such damage. Instead, any such damage would be the result of the media attention and public debate that immediately followed the incident. Madison additionally addressed the other elements of each of the counterclaims, explaining that he is entitled to summary judgment.

The Defendants respond that "damages as a result of injury to reputation and credibility are recoverable in a tort action" for libel, slander, abuse of process, malicious prosecution, and third party contract interference, quoting *Barlow v. Sipes*, 744 N.E.2d 1, 7 (Ind. Ct. App. 2001) and citing *Greives v. Greenwood*, 550 N.E.2d 334, 338 (Ind. Ct. App. 1990). They explain that "[t]hese intentional torts afford this remedy because the result is foreseeable. Foreseeability means that which it is objectively reasonable to expect, not merely what might conceivably occur." *Greives*, 550 N.E.2d at 338. The Defendants then assert that damages for loss of reputation are not easily quantifiable, relying on *Barlow*, 744 N.E.2d at 8. The Defendants conclude that it is enough to survive summary judgment that they have claimed their reputation and character to be damaged by the lawsuit and that they have claimed emotional distress. They claim that, because these types of damages are not easily quantifiable, the question should be permitted to go to a jury.

Turning to the elements of the counterclaims alleged, the Court first considers the abuse of process claim. "The two elements of abuse of process are: (1) ulterior purpose or motives; and (2) a willful use of process not proper in the regular conduct of the proceedings." *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 256 (Ind. Ct. App. 2013). Where the "true motivation was to damage [the claimant's] reputation, there could be an abuse of process claim." *Id.* at 257. To succeed with

an abuse of process claim, the complaining party must show that they have "suffered damage as a proximate result of the suit." *Archem, Inc. v. Simo*, 549 N.E.2d 1054, 1062 (Ind. Ct. App. 1990).

The next counterclaim asserted by Officers Clegg and Clifton is a claim for malicious prosecution. "Malicious prosecution consists of five elements: prosecution, without probable cause, with malice, termination in favor of the original defendant, and damage to the defendant." *Kho v. Pennington*, 875 N.E.2d 208, 217 (Ind. 2007) (Shepard, C.J., concurring).

The tort of intentional infliction of emotional distress is shown when an individual "(1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. The requirements to prove this tort are rigorous." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015) (citation and quotation marks omitted).

A negligence claim consists of three elements: "(1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach." *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007). "In negligence actions, the injured party is entitled to damages proximately caused by the tortfeasor's breach of duty." *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577 (Ind. Ct. App. 2003).

Each of the four counterclaims asserted by the officers requires a showing that Madison's lawsuit caused damage to the officers. Although "[u]ncertainty of dollar amount does not prevent the award of damages," case law is clear that "[d]amages may not be awarded on guess or speculation, but must be ascertainable with reasonable certainty." *Greives*, 550 N.E.2d at 337. Further, while damages as a result of injury to reputation may be recoverable in a tort action for abuse of process and malicious prosecution, *see Barlow*, 744 N.E.2d at 7 and *Greives*, 550 N.E.2d

at 338, "loss of reputation damages are not recoverable in a negligence action as a matter of law." *Greives*, 550 N.E.2d at 338.

Madison designates Officers Clegg and Clifton's deposition testimony to show that the officers cannot establish any damages that they have suffered as a result of Madison's lawsuit. The officers were asked whether they (1) applied for jobs that they did not receive because of the lawsuit; (2) were denied any promotions at work because of the lawsuit; (3) were demoted, suspended, punished, or disciplined because of the lawsuit; (4) received a pay cut because of the lawsuit; or (5) were physically injured because of the lawsuit. The officers testified that they did not suffer any of these things as a result of Madison's lawsuit. (Filing No. 65-15 at 17–18; Filing No. 65-16 at 11–12.) They testified that they experienced hurt feelings and emotional distress because of the incident and the lawsuit, but they have not sought counseling or suffered expenses for this distress or hurt feelings. (*Id.*) Additionally, the officers' testimony indicates that any hurt feelings and emotional distress actually resulted from the media attention and public debate that immediately followed the incident, not the filing of a lawsuit almost a year after the incident.

The Defendants point to the same deposition testimony to explain their reputation and character have been damaged by the lawsuit and that they have experienced emotional distress. They respond that loss of reputation damages are not easily quantifiable, and they should be able to survive summary judgment. However, the designated evidence establishes that the officers have not suffered any damages as a result of the lawsuit. Even if intangible emotional distress or damage to reputation is not easily quantifiable, such cannot be awarded on guesswork or speculation but must be ascertainable with reasonable certainty. The evidence shows that any emotional distress or damage to reputation, if suffered, was a result of the media attention and public debate that immediately followed the incident.

Because Officers Clegg and Clifton cannot show by designated evidence that they suffered damages as a result of Madison's lawsuit, summary judgment is appropriate in favor of Madison on the officers' counterclaims for abuse of process, malicious prosecution, intentional infliction of emotional distress, and negligence.[2]

Therefore, Madison's Cross-Motion for Summary Judgment is **granted**.

## 2.      <u>Defendants' Motion for Summary Judgment</u>

The Defendants moved for summary judgment on Madison's Fourth Amendment claims of excessive force, unreasonable seizure, and unlawful arrest and Fourteenth Amendment claims for equal protection and due process of law against Officers Clegg and Clifton. They also moved for summary judgment on Madison's state law claim of assault against Officer Clegg and the City and his state law claims of battery, false imprisonment, and excessive force against both Officers Clegg and Clifton and the City. They assert that all of Madison's claims are without factual and legal support and therefore must fail.

The Fourth Amendment provides the protection that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

---

[2] Even if Defendants were able to show damages, their claims would still fail. With respect to the abuse of process claim, there is no designated evidence that Madison was improperly using the legal system for an "ulterior motive" or to extort anything from the Defendant Officers. With respect to the malicious prosecution claim, Defendants have not shown that Madison acted without probable cause and the proceedings have not terminated in Defendants' favor. Additionally, there is no evidence of either "outrageous" conduct by Madison or of "severe emotional distress" suffered by the Defendants to support a claim of intentional infliction of emotional distress. Finally, Defendants have shown no duty or breach of duty to support a negligence claim.

A. **Fourth Amendment Claims**

i. Federal Claims for Excessive Force and Unreasonable Seizure

Excessive force claims are analyzed using the Fourth Amendment's "reasonableness" standard in the context of "an arrest, an investigatory stop or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). The Fourth Amendment protects against the use of force that is not "objectively reasonable." *Kinney v. Ind. Youth Ctr.*, 950 F.2d 462, 465 (7th Cir. 1991). The "right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, this right is not without limits; a "police officer's use of force is unconstitutional if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (citation and quotation marks omitted).

Fourth Amendment unreasonable seizure claims, like excessive force claims, are analyzed in light of the totality of the circumstances to determine the objective reasonableness of the seizure. To determine the reasonableness and therefore the constitutionality of a seizure, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (citation and quotation marks omitted). In considering this balance, whether under an excessive force or unreasonable seizure claim, the court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. When considering this balance, the court views the circumstances "from the perspective of a reasonable officer on the scene." *Id.*

14

The alleged excessive force and unreasonable seizure consists of Officer Clegg grabbing Madison's hand and cell phone and then pointing the taser at Madison, ordering Madison to lay face down on the ground after he became compliant, and the officers placing him in handcuffs after he got on the ground, in excess of the time necessary to issue a citation for a traffic stop.

When Officer Clegg exited the police vehicle and began talking to Madison in an overbearing manner, Madison pulled out his cell phone to make a phone call. The officers concede that they knew it was a cell phone and not a weapon. There was nothing illegal about Madison trying to make a phone call. Madison did not verbally or physically threaten the officers. In fact, Madison stood quietly, straddling his bicycle, while the officers talked to him. He did not pose a threat to the officers. The officers directed Madison to put down his cell phone so that they could conduct their investigatory stop. Madison did not put down his cell phone and instead asked to be given a moment to make a phone call. The officers again commanded Madison to put down the cell phone. When Madison continued to try to make a phone call, Officer Clegg abruptly grabbed Madison's hand and took the cell phone. Madison instinctively flinched back in response. In response to Madison's instinctive reaction, the officers reached for their tasers, and Officer Clegg unholstered and pointed his taser at Madison's chest.

Thereafter, Madison immediately raised his hands and said that he would do whatever the officers asked. The officers directed Madison to get on the ground, which he did, and then Officer Clifton handcuffed him.

Under the factors enunciated in *Graham*, questions concerning excessive force and unreasonable seizure remain that should be resolved by a jury. The severity of the crime at issue is extremely minimal—running a stop sign on a bicycle is not a crime but rather a minor traffic infraction. This infraction did not involve physical violence or damage to property. Whether the

suspect posed an immediate threat to the safety of the officers or others appears to be minimal as well—Madison did not verbally or physically threaten the officers, and the officers admitted that they knew the cell phone was a telephone and not a weapon. Whether the suspect was actively resisting arrest or attempting to evade arrest by flight was not at issue—while Madison did not immediately follow the officers' command to put down his cell phone, he did not physically resist the officers or attempt to flee. Whether it was objectively reasonable for Officer Clegg to perceive that the phone call could be a threat to the officers' safety is an issue for trial. Whether Officer Clegg's use of force in grabbing Madison's hand and seizing the cell phone was objectively reasonable also is an issue for the jury to determine. And, whether it was objectively reasonable to place Madison on the ground and in handcuffs under these circumstances is an issue for the trier of fact.

With respect to Officer Clifton, Madison concedes that Officer Clifton did not use excessive force and his mere presence on the scene as "backup" does not support an independent claim for excessive force against Officer Clifton. *See Struck v. Town of Fishers*, 2013 U.S. Dist. LEXIS 37588, at *14 (S.D. Ind. Mar. 19, 2013). A plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). Accordingly, summary judgment is granted in Officer Clifton's favor on these claims.

Upon review of the designated evidence and the totality of the circumstances, the reasonableness of Officer Clegg's actions during the encounter with Madison should be determined by the trier of fact. Therefore, Madison's Fourth Amendment claims for excessive force and unreasonable seizure with respect to Officer Clegg cannot be disposed of by summary judgment.

16

ii. Federal Claim for Unlawful Arrest

Police have probable cause to arrest a person when the circumstances known to them reasonably support a belief that a person has, is, or is about to commit a crime. *Matthews v. City of E. St. Louis*, 675 F.3d 703, 706 (7th Cir. 2012). This determination is based on an objective assessment drawn from facts known at the time of arrest. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). Even then, not every investigatory stop that leads to a brief detention amounts to a custodial arrest. *See Murphy v. Alford*, 2013 U.S. Dist. LEXIS 84556 (S.D. Ind. June 17, 2013); *see also Huff v. Reichert*, 744 F.3d 999, 1005 (7th Cir. 2014) ("A traffic stop can be converted into a full-blown arrest if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made.").

A brief investigatory stop may be justified by reasonable suspicion that the person detained is involved in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 31 (1968). The Fourth Amendment requires "some minimal level of objective justification" for making an investigative stop. *INS v. Delgado*, 466 U.S. 210, 217 (1984). The level of suspicion required for an investigative stop is less demanding than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Any traffic violation, even a minor one, gives an officer probable cause to stop the violator. *See, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 649 (1979).

Madison asserts the stop was pretextual based on the officers' belief that he had given them the middle finger. Even so, Madison admits that he did not stop his bicycle at the stop sign where he encountered Officers Clegg and Clifton. His failure to stop at the stop sign was a violation of Indiana statute and a city ordinance.[3] This infraction, witnessed by the officers, justified the

---

[3] Evansville Municipal Code § 10.25.040 provides: "Any person operating a bicycle shall obey the instructions of official traffic-control signals, signs, and other control devices applicable to vehicles, unless otherwise directed by a law enforcement officer." Failure to stop at a stop sign while riding a bicycle is a Class C infraction in violation of Indiana Code §§ 9-21-4-18, 9-21-4-19, 9-21-11-2, and 9-21-11-14.

officers' decision to conduct a brief investigatory stop. Madison asserts that the officers unlawfully arrested him by placing him under *de facto* arrest without probable cause after seizing him in that the traffic stop extended well beyond the time necessary to issue a citation, which is the only action permissible for running a stop sign on a bicycle. "A traffic stop can be converted into a full-blown arrest if it extends beyond the time reasonably necessary to complete the purpose for which the stop was made." *Huff*, 744 F.3d at 1005. However, under the circumstances in this case, the Court is not persuaded.

Because he was on a bicycle ride, Madison did not have an identification card to provide to the officers. He provided his name and address and informed them that he was a firefighter with the City of Evansville. Officer Clifton processed his information through the Evansville police records system, which revealed an outstanding warrant for a black male named George Madison. The investigatory stop was lengthened because of this outstanding warrant for an individual matching Madison's name, gender, and race. Officer Clifton asked additional questions to clarify Madison's identity. The officers then determined that George Madison Sr., Madison's father, was the subject of the outstanding warrant. After Officer Clifton confirmed Madison's identity, Officer Clifton helped him to his feet and removed the handcuffs. Officer Clegg returned the cell phone to Madison, and then the officers began to advise him that he had to obey traffic laws even when riding a bicycle. The officers did not issue a citation to Madison.

The length of time from when Officer Clegg exited the police vehicle to when Officer Clegg turned on the body camera equipment was approximately one and a half minutes. The length of time from when Officer Clegg turned on the body camera equipment to when he turned off the body camera equipment after getting back into the police vehicle was approximately ten and a half minutes. Therefore, the entire length of Madison's stop was approximately twelve minutes. The

handcuffs were removed from Madison and his cell phone was returned to him after approximately seven minutes from the time the stop began. He continued to converse and interact with the officers for another five minutes, during which time, the officers assert, he was free to leave.

Madison's admitted failure to stop his bicycle at the stop sign is an infraction that justified the officers' decision to conduct a brief investigatory stop and gave them probable cause to make the stop. The designated evidence shows that the investigatory stop and brief detention did not rise to the level of an arrest, and thus, Madison's Fourth Amendment claim for unlawful arrest cannot survive summary judgment. The length of time of the stop was increased because Madison did not have an identification card and his father's name, gender, and race matched his own name, gender, and race, and his father had an outstanding warrant. This delay was reasonably justified.

### B.  Fourteenth Amendment Claims

As noted above, the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Madison alleges that Officers Clegg and Clifton violated his "right to equal protection of the laws by impermissibly discriminating against him on the basis of his race, both when they determined to detain Madison, and in the manner by which they detained him." (Filing No. 1 at 9.) He further alleges that Officers Clegg and Clifton violated his "right to due process of law, when they impermissibly and improperly deprived him of his liberty, both when they determined to detain Madison, and in the manner by which they detained him." (Filing No. 1 at 10–11.)

#### i. Equal Protection

Utilizing impermissible racial classifications in determining whom to stop, detain, and search is a violation of the Equal Protection Clause of the Fourteenth Amendment. *Chavez v. Ill.*

*State Police*, 251 F.3d 612, 635 (7th Cir. 2001). "To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.* at 635–36. "[T]he use of racially derogatory language . . . is strong evidence of racial animus, an essential element of any equal protection claim." *Id.* at 646. Therefore, to succeed on his equal protection claim, Madison must show a discriminatory effect and a discriminatory purpose or intent.

During his encounter with the officers, when Madison tried to explain his feelings by referring to his experience as a young, black male, Officer Clegg interrupted him, saying that race had nothing to do with the stop and investigation. Madison later testified during his deposition that the officers did not use any racial slurs or any profanity during the stop, and he testified that the officers did not give any indication that the stop was motivated by race.

Just a few hours after the incident occurred, during the evening of August 13, Lieutenant Fitzsimmons and Madison discussed the encounter, and Madison explained that he thought the officers pulled him over because of his hand gesture not because of failing to stop at the stop sign. Madison did not mention anything about race or that the stop was racially motivated. Two days later, on August 15, 2013, Madison filed a citizen's complaint under oath and gave a recorded statement to Sergeant Talsma. In the citizen's complaint and recorded statement, Madison explained the encounter with Officers Clegg and Clifton, and he again made no allegation that the stop was racially motivated.

Madison recounted his experience in an August 13 Facebook post, which said nothing about race and which garnered many responses on social media. Many of the responses asserted a suspicion that racial profiling likely was involved. To these comments, Madison replied, "I don't think race has anything to do with it. The way I was approached it could have happened to

20

anybody." (Filing No. 33-3 at 8.) Again, soon after the incident, Madison reported to the Evansville Courier & Press that he did not think the stop was racially motivated (Filing No. 33-3 at 12). Then in a Facebook post to the Evansville Courier & Press on August 27, 2013, Madison stated, "I have never said this was a race issue." (Filing No. 33-3 at 13.)

On September 30, 2013, Madison submitted his "notice of tort claim" to the City of Evansville, and the notice explained that the traffic stop was initiated because of Madison's hand gesture, failure to stop at the stop sign, or both (Filing No. 33-2 at 19). The notice did not include any assertions that the stop was racially motivated.

Eight months after the incident, on May 20, 2014, Madison filed his Complaint asserting race-based claims. Madison was deposed on September 10, 2014, and testified regarding the accuracy and veracity of his earlier statements that he believed race was not an issue with the traffic stop. He then was asked, "And so the first time that race has become an issue is when you filed a complaint seeking money, correct?" to which he replied, "Yes, sir." (Filing No. 33-1 at 24.) Madison then explained that his views regarding race being a motivating factor in the traffic stop changed over time because of conversations with his wife, observations from other similar situations, and reflecting on the incident. Madison testified that he did not have any evidence to show the traffic stop was racially motivated and asserted that only Officers Clegg and Clifton would know in their hearts whether race was a motivating factor for the stop.

In the summary judgment context, the Court's "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture. . . . [The nonmoving party] must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (citations and quotation marks omitted). Furthermore,

"[e]vidence that merely establishes a possibility of cause, or which lacks reasonable certainty or probability, is not enough by itself to support a verdict; in short, liability may not be predicated purely upon speculation." *Thurman v. Prime Quest Mgmt., LLC*, 2010 U.S. Dist. LEXIS 116286, at *11 (S.D. Ind. Nov. 1, 2010).

After discussing this concept of mere speculation in contrast to personal knowledge of facts, the Seventh Circuit determined that the plaintiff in *Ford v. Wilson* failed to support his Section 1983 racial discrimination claim. The Seventh Circuit explained,

> We do not think . . . that the combination of an arbitrary stop . . . with a difference in race between the person stopped and the officer establishes a prima facie case of racial discrimination. Otherwise any time a black arrested a white, or a white arrested a black, the person arrested could, by testifying that the arrest had been groundless, obtain a trial in federal court under 42 U.S.C. § 1983. We used the example of an arrest but the principle would apply equally to traffic stops.

*Ford v. Wilson*, 90 F.3d 245, 248–49 (7th Cir. 1996).

The designated evidence in this matter shows that racial motivation was not at play when Officers Clegg and Clifton decided to stop Madison after he committed a minor traffic violation and that racial motivation was not at play in how the traffic stop was conducted. The body camera recording of the encounter contains no racially derogatory comments or other indications that race was a factor. Madison testified during his deposition that the officers did not use any racial slurs and that they did not give any indication that the stop was motivated by race. The only material that points to racial motivation in the traffic stop is speculative. This cannot support Madison's burden to defeat the Defendants' summary judgment motion. Thus, the Court grants summary judgment in favor of the Defendants on the equal protection claim.

## ii. Due Process

Concerning Madison's deprivation of liberty due process claim, Defendants explain that Madison did not specify whether his claim is for substantive due process or procedural due process.

22

Defendants assert that any procedural due process claim fails as a matter of law because Madison has made no effort to show that state law does not provide an adequate post-deprivation remedy, and in fact, state law does provide adequate post-deprivation remedies to him. Defendants then assert that any substantive due process claim fails as a matter of law because such a claim is covered by the Fourth Amendment, citing *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). In *County of Sacramento* the Supreme Court explained,

> *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is covered by the Fourth Amendment. . . . The Fourth Amendment covers only searches and seizures.

*County of Sacramento*, 523 U.S. at 843 (citation and quotation marks omitted). The Seventh Circuit also explained this rule of law; "The Fourth Amendment, not the due process clause, is the proper basis for challenging the lawfulness of an arrest. Moreover, the Supreme Court has made it clear that a substantive due process claim may not be maintained where a specific constitutional provision protects the right at issue." *Alexander v. McKinney*, 692 F.3d 553, 558 (7th Cir. 2012) (citations omitted).

In his response to the Defendants' due process argument, Madison appears to be alleging a substantive due process claim, not a procedural due process claim. This is consistent with Madison's due process allegations in his Complaint. However, Madison fails to address the Defendants' argument that, based on Supreme Court precedent from *County of Sacramento*, his deprivation of liberty due process claim is subsumed into his Fourth Amendment unreasonable seizure and unlawful arrest claims. Madison's due process claim for the officers' allegedly impermissible and improper deprivation of his liberty, both when they determined to detain him and the manner by which they detained him, is covered by the Fourth Amendment. Therefore,

23

Madison's due process claim fails as a matter of law, and the Defendants are entitled to summary judgment on this claim.

### iii. Failure to Intervene

Under both his Fourth Amendment and Fourteenth Amendment claims, Madison also asserts that Officers Clegg and Clifton failed to intervene or to restrain one another from violating his constitutional rights.

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). In his deposition, Madison testified that the officers could not have intervened to stop the other officer's actions throughout the encounter. Indeed, the initial traffic stop was legal and valid because it was supported by probable cause where the officers saw Madison fail to stop at the stop sign. The actions of the officers during the detention occurred quickly and in close proximity to Madison, and neither would have had a realistic opportunity to intervene. Therefore, the Court determines that the Defendants are entitled to summary judgment on the "duty to intervene" claim.

### C. <u>Qualified Immunity of the Officers</u>

Defendants next assert that Officers Clegg and Clifton are entitled to qualified immunity against the Fourth and Fourteenth Amendment claims asserted by Madison. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity gives government officials breathing room to make reasonable but mistaken

judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (citation and quotation marks omitted).

To determine whether qualified immunity applies, the Court must determine whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court also determines "whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "To be clearly established, at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citation and quotation marks omitted). "While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citation and quotation marks omitted).

In the context of a claim for excessive force, "there is no doubt that [case law] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201–02.

> Yet that is not enough. Rather, we emphasized in *Anderson* "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 483 U.S. at 640. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.* at 202.

Madison responds to this case law and the Defendants' claim to qualified immunity by asserting that he does not have to demonstrate that the "very action in question" was previously

held to be unlawful, but rather, in light of the law in effect at the time, "a reasonable officer would have known that the particular action at issue . . . was unlawful." (Filing No. 65 at 31 (quoting *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)))). He asserts that, in the alternative, a plaintiff alleging excessive force may instead demonstrate that "the force used was so plainly excessive under the circumstances that a reasonable officer would have known of the constitutional violation." *Frazell v. Flanigan*, 102 F.3d 877, 886 (7th Cir. 1996).

In considering the issue of qualified immunity, Madison has failed to show that the force used was "so plainly excessive under the circumstances that a reasonable officer would have known of the constitutional violation" or that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." While generally speaking the use of excessive force is understood to be a constitutional violation, in the particular circumstances of this case, the evidence and facts show that the conduct and force are not so clearly excessive to defeat the claim for qualified immunity. Madison concedes that Officer Clifton did nothing during the stop that made him fearful and that Officer Clifton was professional, courteous, and treated him with respect during the stop (Filing No. 33-1 at 14). Officer Clegg did not use the taser after pointing it at Madison and did not violently throw him to the ground. Madison was not physically injured by the encounter with the officers. This same case law and reasoning supports qualified immunity under the unreasonable seizure claim. Therefore, the Court determines that the evidence supports a finding of qualified immunity for Officers Clegg and Clifton for the Fourth and Fourteenth Amendment claims.

Because these constitutional claims were brought against the officers only, and not against the City, and because of the officers' qualified immunity, summary judgment is granted to the Defendants on the federal constitutional claims.

### D.  State Law Claims

In addition to his constitutional claims, Madison asserted state law tort claims for assault against Officer Clegg and the City and for battery, false imprisonment, and excessive force against Officers Clegg and Clifton and against the City under the doctrine of *respondeat superior*. A person commits the tort of battery when "(a) he acts intending to cause a harmful or offensive contact with the person or of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 914 (S.D. Ind. 2009).  An assault occurs "when one acts intending to cause a harmful or offensive contact with the person of the other or an imminent apprehension of such contact."  *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind. 1991) (quoting Restatement (Second) of Torts § 21 (1)(a) (1965)). Further,

> Under Indiana law, a police officer may use only the force that is reasonable and necessary for effecting an arrest. Ind. Code § 35-41-3-3(b). If a police officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery. *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. App. 1995); *City of South Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. App. 1979). Indiana's excessive force standard effectively parallels the federal standard outlined above. See *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000).

*Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S.D. Ind. 2006). As recently stated by the Indiana Supreme Court, "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010). "Any claim that excessive force was used by a police officer when making an arrest is analyzed under

the reasonableness standard of the Fourth Amendment to the United States Constitution." *Brooks v. Anderson Police Dep't*, 975 N.E.2d 395, 399 (Ind. Ct. App. 2012).

Defendants assert that they are entitled to summary judgment on the Fourth Amendment claims because of the reasonableness of the traffic stop and the ensuing interactions between the officers and Madison, and therefore, they also are entitled to summary judgment on Madison's state law tort claims for assault, battery, and excessive force.

Madison responds, "But for the same reasons the Fourth Amendment claims should survive, so too should the state law claims." (Filing No. 65 at 33.) Madison asserts that Indiana's state laws regarding assault and battery are distinct from Fourth Amendment excessive force claims, and he then claims that the analysis of the claims are not conterminous. He acknowledges the Defendants' cited case law and their legal consequences, but then he claims that those cases only hold that an excessive force claim may give rise to assault and battery claims, not that they are subsumed by the excessive force claim or analyzed in the same manner. However, Madison does not point to case law that holds assault and battery claims are not subsumed by or analyzed in the same manner as excessive force claims in the law enforcement context.

Regardless, based on the Court's earlier analysis of Madison's Fourth Amendment claims for excessive force and unreasonable seizure, the Court determines that Officer Clegg and the City are not entitled to summary judgment on Madison's state law tort claims for assault, battery, and excessive force because of questions that remain to be resolved by a jury. Immunity against state tort claims under the Indiana Tort Claims Act, Ind. Code § 34-13-3-3(8), does not apply to excessive force claims. *See Fidler*, 428 F. Supp. 2d at 866–67; *Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993). Therefore, these tort claims remain for a jury to decide.

Turning to the remaining state law claim of false imprisonment, Defendants succinctly explain that false imprisonment under Indiana law is defined as "the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003). Probable cause is a defense to a false imprisonment claim. *Id.* The Defendants then assert that the officers' actions in stopping and detaining Madison were lawful and supported by probable cause, and thus the false imprisonment claim fails as a matter of law. Madison agrees with the Defendants' explanation of false imprisonment and that probable cause serves as a defense to the claim. He then points back to his prior arguments that the stop and ensuing interactions were unreasonable and unlawful.

Based on the Court's earlier determination that the investigatory stop did not rise to the level of an arrest (and therefore was not an unlawful arrest), and because the officers had probable cause to stop Madison based on witnessing his failure to stop at the stop sign, the Defendants are entitled to summary judgment on Madison's state law tort claim for false imprisonment.

### E. Supplemental Jurisdiction

The final issue before the Court is a determination of where the remaining state law claims should be tried. When federal law claims are dismissed before trial, the district court should decide whether to maintain or relinquish its supplemental jurisdiction over state law claims. Relevant factors to inform the decision are judicial economy, convenience, fairness, and comity. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343 (1988); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 794 (7th Cir. 2015). Ordinarily, the court should relinquish jurisdiction when the federal claims are disposed of before trial. *Sharp Elecs. Corp. v. Metropolitan Life Ins. Co*., 578 F.3d 505, 514 (7th Cir. 2009). Here, however, the Court has already expended effort on Madison's state law claims as well as the Defendants' defense of those claims. This action was not removed from state court

so remand is not an option. The matter is set for trial on January 25, 2016. Because the claims can be efficiently adjudicated in federal court the Court exercises its supplemental jurisdiction.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff George Madison, Jr.'s Cross-Motion for Summary Judgment on Defendants' Counterclaim (Filing No. 64) is **GRANTED**. Defendants City of Evansville, Jasen Clegg, and Darin Clifton's Motion for Summary Judgment (Filing No. 33) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is granted on behalf of Officer Clifton on all claims. Summary judgment is granted on behalf of Officer Clegg on Madison's Fourth Amendment claims and Fourteenth Amendment claims. Summary judgment also is granted on behalf of all Defendants on Madison's state law claim for false imprisonment. Madison's state law tort claims for assault, battery, and excessive force against the City of Evansville and Jasen Clegg remain pending for trial.

Finally, Defendants' Motion to File Reply to Plaintiff's Surreply (Filing No. 83) is GRANTED.

**SO ORDERED.**

Date: 12/23/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

30

Distribution:

William M. Krowl
KROWL LAW, LLC
krowllegal@gmail.com

Mark W. Sniderman
SNIDERMAN NGUYEN LLP
mark@snlawyers.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com